George W. Higgins, Appellant, v. Decorah Produce Company et al., Appellees.

No. 41313.

April 5, 1932.

E. R. Acres and C. N. Houck, for appellant.

Frank Sayre, for Decorah Produce Company and H. H. Woldum, appellees.

J. G. Gamble and A. B. Howland, for C. R. I. & P. Ry. Co. and Burlington, Cedar Rapids & Northern Railway Company, appellees.

Stevens, J.—The Decorah Produce Company owns and operates a poultry and produce plant on the north side of Water Street in Decorah, Iowa.

 The buildings of the company are located on property of the Chicago, Rock Island & Pacific Ry. Co. Water Street, over which state highway No. 9 passes, lies east and west. South of this street there is a residential section of the city. The space on the north side of Water Street between it and South Street, the first street north, is occupied by the main tracks, switches, roundhouse and depot of the Chicago, Rock Island & Pacific Ry.

Co: and the main track of the Chicago, Milwaukee & St. Paul Ry. Co. The depot of the Rock Island Railroad Company lies two and one-half blocks west and a little over one-half block north of the Produce plant. Immediately south of the Produce plant there is a row of residences fronting on Water Street. In the immediate vicinity of the Produce Company's plant and on the same side of Water Street are coal yards, a creamery, ice-house and other buildings. A short distance northeast of the Produce plant is the Rock Island roundhouse, and slightly over two blocks north are the stockyards of the railroad company. Night trains are run by the Chicago, Rock Island & P. Ry. Co. over its tracks in the vicinity. Extending east and west across the north one-half of the several blocks between Water and South Streets is what is denominated in the evidence "Dry Run." There are other buildings of a commercial or industrial character in the vicinity of the Produce plant. The industrial district referred to comprises substantially five city blocks. The Produce plant fronting on Water Street lies approximately in the center east and west of this district. Appellant's property is situated on the south side of the street a short distance east of the Produce plant and fronts on Water Street. The distance from the southwesterly corner of the main building to the northeast corner of appellant's house is 140 feet and to the northeast corner of the McAndrews house 197 feet. The residence owned by appellant is occupied by tenants.

It will thus be observed that Water Street separates a distinctly commercial and industrial district on the north from a residential district on the south. The Produce plant now owned and operated by appellee was established in 1910 at which time the killing of poultry was begun. The building then used was 24x80 feet, one story with basement. This plant was entirely destroyed by fire in 1912. A new building was erected and in 1929 as an addition 56x75 feet with basement. The building contains from 75 to 100 windows, all of which are kept open during the warm season. It appears to be equipped with modern equipment and improvements and to be operated in reasonably sanitary manner. It represents an investment of from $65,000 to $75,000. Poultry is brought to the plant by farmers or gathered in trucks from a territory within a radius of fifty miles of Decorah. The poultry is brought to the plant in trucks, the

birds removed, weighed and immediately placed in feeding batteries. The feeding batteries are constructed of steel wire and are 5x4x5 feet, each containing four wire floors. Attached to the feeding batteries on the outside of the cage are troughs in which the feed is placed for the poultry. The feed consists of oatmeal mixed with water and buttermilk in clean tanks. Beneath the wire floors in each of the feeding batteries are pans into which the offal is deposited. There are a large number of feeding batteries and many thousand birds are brought to and slaughtered in the plant annually. The poultry is conveyed in groups of five to the basement where they are killed. There are scalding vats in the killing room in which the birds are immersed preparatory to picking the feathers. When the feathers have been removed, the birds are dipped in a vessel containing hot tallow and paraffin for the purpose of removing the pin and other small feathers and dirt from the pores. The floors in the feeding batteries are cleaned daily and disinfected and the offal collected therefrom is hauled away from the plant in an open conveyance. In 1929, about 900,000 pounds of poultry, 24,000 cases of eggs, 8 carloads of feathers and other produce were shipped from the plant. In the operation of the plant, the blood is carried through a funnel into a vessel, preserved, placed in a barrel and hauled away from the plant. The floors of the killing room are cleaned and scraped daily. Much poultry arrives at the plant during the night, mostly before midnight.

The testimony is somewhat conflicting, but numerous witnesses residing in the immediate vicinity of the plant or familiar with the situation in the vicinity of appellant's property testified that there are foul and offensive odors from the plant which interfere with the comfort of those residing in the community and that the crowing of roosters and cackling of hens disturb their rest at night and prevent sleeping. The offensive odors alleged to come from the plant are, according to this testimony, more offensive in the warm weather and when the wind is blowing from the northeast. During the colder season, when the windows of the plant are closed, the peace and comfort of the neighborhood are little disturbed.

There was testimony on the part of some of the witnesses tending to show that the odors were both offensive and nauseating,—particularly such was the testimony of appellant's tenants.

Other residents of the immediate vicinity of appellant's property gave similar, though considerably modified, accounts of the annoyance and discomfort produced by the plant. The testimony introduced on behalf of appellee tended to minimize the extent of the odors and noises arising from the plant, but admitted that the interior of the plant is not entirely free from odors. Some of the witnesses were, no doubt, less sensitive to the crowing of the cocks and the cackling of the hens and were not disturbed thereby. It appears that one or more of the residents of the vicinity keep chickens in their backyards. The testimony of medical experts and others tended rather strongly to negative the claim of appellant that foul and decaying matter is left upon the premises and that the plant is not kept as clean and sanitary as it should be. The building abuts directly upon Water Street, which, as stated, is used as a part of State Highway No. 9.

It appears that the offal is kept in, and hauled from the plant in, an open vehicle, and that the odor therefrom at times is very offensive. The paraffin when removed from the dead fowl is replaced in the vat from which it was taken and again heated and used. One or more of the witnesses for appellee testified that much of the odor from the plant comes from these two sources.

The property of appellant, which is a modern dwelling house, has been owned by him for many years. There is a conflict in the testimony as to the extent of the stench or odor that comes from Dry Run and the other plants located and operated in the vicinity.

A poultry and produce plant such as we have described is not a nuisance, *per se*. If, however, it is so located, maintained and operated as to emit noxious odors or give off noises so as essentially to interfere with the comfortable enjoyment of the property of others, it may constitute a nuisance. A perfectly lawful business, operated under some circumstances and in some locations, may so interfere with the comfortable use and enjoyment of private property as to constitute a private nuisance and, when this occurs, it is subject to abatement as such. McGill v. Pintsch Co., 140 Iowa 429; Bushnell v. Robeson, 62 Iowa 540; Bowman v. Humphrey, 132 Iowa 234; Daniels v. Keokuk Water Wks., 61 Iowa 549; Smith v. City of Jefferson, 161 Iowa 245; Mitchell v. Flynn Dairy Co., 172 Iowa 582. This is the general

rule and is well supported by the weight of authority. Gus Blass Dry Goods Co. v. Reinman & Wolfort, 143 S. W. (Ark.) 1087; Kinsman v. Gas. Co., 177 Pac. (Utah) 418; Winbigler v. Clift, 172 Pac. (Kans.) 537; Saier v. Joy, 164 N. W. (Mich.) 507; Brede v. Minn. Crushed Stone Co., 173 N. W. (Minn.) 805; Pearson & Son v. Bonnie, 272 S. W. (Ky.) 375; Wood v. City of Chickasha, 257 Pac. (Okla.) 286; Lead v. Inch, 134 N. W. (Minn.) 218.

Every property owner or person has a right to have the air diffused over his premises in its natural state and without being unduly impregnated with foreign substances, such as smoke, soot, noisome fumes and other offensive matters; but air in congested centers of population is seldom absolutely pure and cannot reasonably be expected to be. McGill v. Pintsch Co., supra. In every city, smoke, soot and more or less offensive odors and noises calculated to disturb and interfere with the comfort of residents are present and cannot be avoided. The air in such circumstances is more or less necessarily impregnated with foreign substances. Residents and property owners must, therefore, endure, without the right of legal recourse, annoyances and discomforts ordinarily and necessarily incident to urban life. Dixie Ice Cream Co. v. Blackwell, 58 A. L. R. (Ala.) 1223; Holman v. Laundry Co., 6 A. L. R. (Ga.) 1564; Sullivan v. Jones & Laughlin Steel Co., 57 Atl. (Pa.) 1065. On the other hand, if a private nuisance is shown to exist and that substantial, material and irreparable injury is resulting therefrom, the nuisance will be abated, irrespective of resulting damage. Rowland v. N. Y. Stable Manure Co., 101 Atl. (N. J.) 521. Not every instrumentality producing more or less disturbance and discomfort to the owners of property and residents in the community can be abated as a nuisance. A person residing near a railway track, for instance, or in the vicinity of switchyards or of a roundhouse must endure such discomforts as are reasonably and necessarily incident to the conduct and operation of the railroad. Dunsmore v. Central Ia. Ry. Co., 72 Iowa 182; Bennett v. National Starch Mfg. Co., 103 Iowa 207; McGill v. Pintsch Co., supra; Sprout v. Levinson, 148 Atl. (Pa.) 511; Strachan v. Beacon Oil Co., 146 N. E. (Mass.) 787; Clark v. Wambold, 160 N. W. (Wis.) 1039; Dolan v. Chicago, M. & St. P. R. Co., 95 N. W. (Wis.) 385; Soderburg v. Chicago, St. P. M. & O. Ry. Co.,

167 Iowa 123; Wade v. Miller, 73 N. E. (Mass.) 849. We held, however, in Shively v. C. R., I. F. & N. W. Ry. Co., 74 Iowa 169, that the erection of stockyards so near to a dwelling house as that the odors therefrom constitute a nuisance when unwholesome and injurious to health could not be defended on the ground that it was necessary to the operation of the railroad.

It is a matter of common knowledge that live poultry may not be handled even with the most scrupulous care without causing more or less noise and confusion. Chickens confined in coops or feeding batteries or at liberty in ordinary chicken houses will cackle and crow more or less early in the morning and at other times when disturbed. Unless the feeding troughs are promptly cleansed and all decaying feed prevented from remaining therein, or if the offal, blood, feathers and other matter accumulating about appellee's plant are not promptly and carefully disposed of, more or less odor of varying degrees of offensiveness will inevitably arise therefrom. It has been held that the squealing of pigs, odors arising from hen houses, together with the noises incident thereto, do not constitute nuisances. Clark v. Wambold, 160 N. W. (Wis.) 1039; Wade v. Miller, 73 N. E. (Mass.) 849; Ballentine v. Webb, 47 N. W. (Mich.) 485.

Noises may be of such a character and intensity as to so unreasonably interfere with the comfort and enjoyment of private property as to constitute a nuisance, and, in such cases, injury to the health of the complaining party need not be shown. Baker v. Bohannan, 69 Iowa 60; State v. Chicago G. W. R. Co., 166 Iowa 494; Boyd v. City of Oskaloosa, 179 Iowa 387; Pauly v. Montgomery, 209 Iowa 699.

Appellant acquired his property adjacent to the Produce plant many years ago. It appears, however, that the enlargement of the plant and of the business conducted by appellee has increased the extent and intensity of the offensive odors and noisome disturbances resulting from its operation. In any event, he is not necessarily estopped from maintaining this action. Van Fossen v. Clark, 113 Iowa 86, 87; Payne v. Wayland, 131 Iowa 659; City of Waterloo v. Waterloo, C. F. & N. R. Co., 149 Iowa 129; Andrews v. West. Asphalt Pav. Corp., 193 Iowa 1047.

As stated, there is much conflict in the testimony in this case. Some of the witnesses called by appellant testified that the odors were not so offensive as they have been at other times and

all agreed that they are greatest in warm weather. No one appears to have suffered any particular inconvenience because of the proximity of the railroads, ice, gas and ice cream plants. Some, accustomed to the noise of the chickens, were not disturbed thereby. The plant has become the market place for poultry in large quantities coming from a considerable territory. It employs a large number of people and has a substantial pay roll. The premises were visited and inspected by representatives of the Chamber of Commerce and other citizens shortly prior to the trial, and the testimony of those who were called by appellee tended very greatly to minimize the extent of the odors present at and about the plant. Appellee may not entirely escape liability for nuisance because the plant is located within an industrial district. It is also adjacent to a residential district. It should, however, be noted that the area of the residential section affected by the plant is small and largely confined to a few properties situated in the immediate vicinity of the plant.

We are satisfied from the testimony, when read and considered as a whole, that the extent of the noise and offensive odors coming from the plant is much less than claimed by the testimony of some of appellant's witnesses. One person may be and probably is much more sensitive to such matters than others. In passing upon questions of the character before us, courts must have in mind the effect of such offensive matters upon persons of ordinary and reasonable sensibilities. Nevertheless, it seems to us that some of the possible sources of alleged offensive odors may be largely, if not wholly, avoided. The odor arising from scalding chickens is, no doubt, difficult to minimize to any considerable extent. The accumulation of decaying food, if any, in the feeding troughs may be wholly avoided. The removal of the offal from the feeding batteries should be sufficiently prompt and thorough to eliminate most of the complaint from this source. It should not be permitted to be placed in, or to remain about, the plant in open containers, nor should it be conveyed in open trucks or wagons. This should be remedied. The tallow and paraffin removed from the dead fowls necessarily becomes so mixed with foreign substances that, when repeatedly reheated, it becomes offensive. It appears to be the custom at the plant to replace the tallow and paraffin in the vats for reheating. This operation should not be repeated until the odor

arising from the vat is substantially intensified thereby. In other words, too frequent repetition must be avoided. The killing room and all other parts of the plant and premises should be kept scrupulously clean and sanitary. We do not overlook the testimony on behalf of appellee on this point, but there are always possibilities of improvement in sanitation and cleanliness. The odors from the plant are little noticed by appellant or those residing in his immediate vicinity, except when the wind in the warmer season blows from the northeast. This is not the prevailing direction from which the breezes come in the summer season. The property of appellant consists of a valuable modern dwelling house and improved grounds, and while the area in the residential section affected by the matters complained of is very small, this is not a defense to appellant's action. The evidence does show, however, that there are more or less noises in the community from the operation of railway trains, ice and other plants, and that some odor escapes from the gas plant and, no doubt, from the stockyards located farther away. Upon the record before us, we are of the opinion that the operation of the Produce plant should not be enjoined. The decree will be modified, however, to the extent that appellees will be enjoined from placing the offal from the feeding batteries and other sources in open cans or placed about the premises in open containers and from being removed therefrom in open conveyances. Accumulations of this character must be placed in and removed in closed containers. The decree will also be modified so as to prohibit the use of tallow and paraffin with which other substances have been mixed so as to increase the odor from the heating vat in which same are placed.

II. It is the contention of appellant that the plant comes within the definition of a slaughterhouse, and that its operation is prohibited both by the city ordinance of Decorah and Chapter 133 of the Code of 1931. The ordinance of the city, in so far, if at all, as it was designed to apply to poultry houses where killing is done, has been modified by the action of the city council. Chapter 133 of the Code relates to hotels, restaurants and food establishments, and is designed to provide regulations intended to preserve the purity of food products used by the various establishments designated. For this purpose, Subdivision 7 of Section 2808 is made to include establish-

ments in which animals or poultry are killed or dressed for food, and they are defined as slaughterhouses for the purposes of this chapter. This purpose is further indicated by the specific provisions of Section 2825 of the same chapter. Cleanliness and the utmost sanitation in hotels, restaurants and other eating establishments are required by this chapter, which also includes all necessary means and methods of enforcing its purpose. It has no application to a controversy with a private property owner in an action to abate a private nuisance. The decree from which this appeal is taken will be modified and the appellees enjoined from placing, maintaining or removing the offal from the feeding batteries and premises in anything but closed containers, and also so as to restrain the improper use of the tallow and paraffin. In all other respects, the decree is affirmed. Decree may be entered in this court at the election of either party, or the cause will be remanded to the district court for decree. The appellee will be allowed not to exceed sixty days in which to comply fully with the requirements of the decree.—Modified and affirmed.

WAGNER, C. J., and FAVILLE, DE GRAFF, ALBERT, and MORLING, JJ., concur.